## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**THELMA JEAN LAMBERT LIVING TRUST,**
**by its trustees Thelma Jean Lambert and Duane**
**Lambert, on behalf of itself, and CRIEG**
**RITTENHOUSE and BERNITA**
**RITTENHOUSE on behalf of themselves and all**
**others similarly situated,**

**Case No. 14-1220-JAR-TJJ**

      **Plaintiffs,**

      **v.**

**CHEVRON U.S.A., INC.; FOUR STAR OIL &**
**GAS COMPANY; CHEVRON TEXACO**
**EXPLORATION PRODUCTION INC.;**
**(including predecessors and successors),**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiffs Thelma Jean Lambert Living Trust ("the Trust") and Crieg and Bernita Rittenhouse bring this lawsuit to recover underpaid royalties due on wells operated by Defendants Chevron U.S.A. Inc., Chevron Texaco Exploration Production, Inc., and Four Star Oil & Gas Company ("Four Star") (collectively "Chevron"). Before the Court is Defendants' Motion for Summary Judgment as to Lambert and Motion to Dismiss All Kansas Claims (Doc. 40). In conjunction with this motion, the Court also considers the Trust's Motion to Strike Most of the Declaration of Alan Bates as Improper Opinion and Conclusory Testimony (Doc. 119). These motions are fully briefed after a period of discovery was provided under Fed. R. Civ. P. 56(d), and the Court is prepared to rule. As described more fully below, the Court denies the Trust's motion to strike and grants in part and denies in part Chevron's motion for summary judgment as to the Trust. The motion is granted as to the marketable condition rule except for the Kansas conservation fee reimbursement claim.

## I.    Procedural and Factual History

Plaintiff Thelma Jean Lambert Living Trust is a royalty owner of two natural gas wells, Evenson #1 and #2, in Seward County, Kansas, operated by Chevron.  Crieg and Bernita Rittenhouse are royalty owners of wells operated by Chevron in Texas County, Oklahoma.  They bring claims individually and on behalf of a putative class of royalty owners in Chevron-operated wells in Kansas and Oklahoma from December 23, 2009 to the present.  The Trust seeks only to represent the Kansas portion of the class and the Rittenhouses seek only to represent the Oklahoma portion of the class.

Natural gas must meet certain quality specifications before it can enter an interstate pipeline.  Namely, it must undergo "midstream gathering and processing."  Chevron contracts with third parties to perform gathering and processing, and this case deals with how those midstream gathering and processing costs are shared, if at all, between Chevron and the Trust under the terms of the leases, and the implied duties that attach thereto.  Plaintiffs allege that Chevron underpaid royalty owners by taking numerous volumetric and fee-based deductions before the gas products were in marketable condition that were not revealed on the royalty owners' check stubs.  Each gas contract has some type of in-kind fee and some type of monetary fee to pay for the midstream Gathering, Compression, Dehydration, Treatment, and Processing ("GCDTP") services.  Plaintiffs allege that Chevron paid royalty on the net, not gross, gas contract value, in breach of the marketable condition rule.  Plaintiffs claim that Chevron passes these midstream processing costs onto the royalty owners because the purported "sales" to third-party purchaser ONEOK are not true purchases; the actual gas products cannot be sold until they enter the commercial market for the starting price of each gas product.

For these reasons, beginning on December 23, 2009, Plaintiffs maintain that Chevron breached an implied covenant to place the gas and its constituent parts in "marketable condition" at Chevron's exclusive cost, and that Chevron breached the implied duty of good faith and fair dealing by entering into gas purchase agreements with ONEOK on paper only, thereby hiding the midstream processing costs that were passed on to the royalty owners.  Part of the Trust's claim is that Chevron improperly deducted from royalties the Kansas Conservation Fee, which the Kansas Supreme Court has held may not be shared with royalty owners.[1]

Plaintiffs originally filed this proposed class action complaint in Seward County District Court on June 9, 2014; Chevron removed the case on July 16, 2014.  The parties entered into a phased pretrial management plan; a Phase I Class Action Certification Scheduling Order was entered on December 5, 2014.[2]  This Order, as amended, contemplated class certification discovery completed by mid-2016, and the deadline for Plaintiffs to file a class certification motion was set for January 14, 2016.[3]  During this period, the parties exchanged a substantial amount of document discovery.

On October 8, 2015, before Plaintiffs had filed their motion for class certification, Chevron moved for summary judgment based on a July 2, 2015 Kansas Supreme Court decision, *Fawcett v. Oil Producers, Inc. of Kansas*.[4]  That case squarely addresses the marketable condition rule as it applies to third-party purchase agreements similar to those Chevron entered into in this case.  Plaintiffs argued that the summary judgment motion was premature, and that it should not be required to respond until after the class certification motion was decided.  Plaintiffs

---

[1] *Hockett v. Trees Oil Co.*, 251 P.3d 65, 71 (Kan. 2011).

[2] Doc. 26.

[3] Doc. 36.

[4] 352 P.3d 1032 (Kan. 2015).

also sought leave to amend, in order to clarify certain facts, align the breach of lease allegations to the standards set forth in *Fawcett*, and add the claim that Chevron improperly passed along the Kansas Conservation Fee to royalty owners.  Magistrate Judge James granted Plaintiffs' motion for leave to amend, excusing its untimeliness in light of the *Fawcett* decision and the relatively early stage of this proposed class action.  Judge James further determined that the motion for summary judgment was not premature; Chevron was not precluded by the phased deadlines in this case from filing a dispositive motion.  Both sides acknowledged the import of the *Fawcett* decision on the Kansas claims in this case, and Judge James determined that whether summary judgment is appropriate as to the named Plaintiff under *Fawcett* should be decided before class certification.  Judge James further granted the Trust additional time under Fed. R. Civ. P. 56(d) in order to conduct discovery necessary to oppose the summary judgment motion, setting a May deadline for the response.  The Trust had argued that it needed further discovery regarding the terms of Chevron's third-party purchase agreements in order to discuss the implied duties implicated by the *Fawcett* decision.  After the reply was filed, the Trust sought leave to file a sur-reply, and moved to strike the declaration of Alan Bates that was attached to Chevron's reply memorandum.  The Court allowed the Trust leave to file a sur-reply, and granted Chevron's motion to file a sur-response.  The parties have also filed notices of supplemental authorities since the briefs were filed.  The Court has reviewed all of these pleadings and supplemental authorities in deciding the motions.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[5]  In

---

[5]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[6]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[7]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[9]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[10]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[11]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[12]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[13]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[6]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[7]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[8]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[9]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[10]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[11]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[12]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[13]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[14]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[15]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[16]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[17]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[19]

## III.    The *Fawcett* Decision

As already mentioned, the instant motion for summary judgment is based almost entirely on the 2015 *Fawcett* decision by the Kansas Supreme Court.  The parties vehemently dispute the scope of the court's holding in *Fawcett*, and how it applies to the facts of this case.  Chevron urges that under *Fawcett*, summary judgment is warranted as a matter of law, whereas the Trust contends that *Fawcett* opens the door to genuine factual disputes about good faith.  Both parties filed numerous evidentiary objections and motions to strike the summary judgment evidence.  In

---

[14]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[15]*Adams*, 233 F.3d at 1246.

[16]Fed. R. Civ. P. 56(c)(4).

[17]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[18]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[19]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

order to consider these objections and determine the uncontroverted facts in this matter, the Court must first discuss its understanding of the *Fawcett* decision, and the degree to which it leaves open factual questions that may apply to the Trust's breach of lease claim in this case.[20]

*Fawcett* was a class action lawsuit alleging underpayment of royalties claimed under twenty-five oil and gas leases where the lessee-operator sold raw natural gas at the wellhead to third parties that in turn processed the gas before it entered the interstate pipeline system.[21]  The issue before the court was "whether the operator may take into account the deductions and adjustment identified in the third-party purchase agreements when calculating royalties" to the lessors.[22]  To answer this question, the court had to consider the reach of the marketable condition rule, which it characterized as an "off-shoot" or "corollary" to the implied duty to market.  The marketable condition rule requires operators to make gas marketable at their own expense.[23]  The third-party purchase agreements contained a quality requirement allowing the purchaser to refuse delivery or acceptance of the gas with lower treatment costs, if the gas is not in a certain, specified condition.  There was no evidence that costs had been assessed due to failure to adhere to the contracts' quality standards.

The leases at issue in *Fawcett* were "*Waechter* leases" that required the lessee to pay the lessor "one eighth of the proceeds if sold at the well, or if marketed off the leased premises, then one-eighth of the market value at the well."[24]  The class argued that under the marketable condition rule, the operator must "bear the entire expense of transforming raw natural gas into

---

[20]The breach of lease claim is the only claim brought under Kansas law; Count 2 for breach of fiduciary duty is brought under Oklahoma law and is asserted by the Rittenhouses only.

[21]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1034 (Kan. 2015).

[22]*Id.*

[23]*Id.* at 1034–35.

[24]*Id.* at 1039 (quoting *Waechter v. Amoco Prod. Co.*, 537 P.2d 228, 230 (Kan. 1975)) (accepting the Kansas Court of Appeals' finding that 22 of the 25 leases were *Waechter* leases, and the other three were combination leases that should be deemed *Waechter* leases, findings that were not challenged by the parties).

the quality required for transmission into the interstate pipeline system."[25]  The court rejected this argument, finding that the duty to prepare the gas for market under the marketable condition rule does not require the gas to be at interstate pipeline quality.[26]  The court proceeded to consider the Kansas cases construing the marketable condition rule.[27]  When these cases are taken together, the court concluded they show that "when gas is sold at the well it has been marketed."[28]  Moreover, the court explained that these cases prohibit an operator from deducting pre-sale expenses required to make gas acceptable to third-party purchasers when gas is sold at the well, but "post-sale, post-production expenses to fractionate raw natural gas into its various valuable components or transform it into interstate pipeline quality gas are different than expenses of drilling and equipping the well or delivering the gas to the purchaser."[29]

> We hold that when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses. In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. *See Waechter*, 217 Kan. 489, Syl. ¶ 2, 537 P.2d 228. OPIK satisfied its duty to market the gas when the gas was sold at the wellhead. When calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared.
>
> We are sensitive to the potential for claims of mischief given an operator's unilateral control over production and marketing decisions. But we believe royalty owners' interests are adequately protected by the operator's implied covenant of good faith and fair dealing and the implied duty to market. The latter demands that operators market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence, having due regard for the interests of both the lessor and lessee, would do under the same or similar circumstances. *See Smith*, 272 Kan. at 85, 31 P.3d 255; *Robbins*, 246 Kan. at 131, 785 P.2d 1010.

---

[25]*Id.*

[26]*Id.*

[27]*Id.* at 1040–41 (discussing *Gilmore v. Superior Oil Co.*, 388 P.2d 602 (Kan. 1964); *Schupbach v. Continental Oil Co.*, 394 P.2d 1 (Kan. 1964); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788 (Kan. 1995)).

[28]*Id.* at 1041.

[29]*Id.* at 1041–42.

> In this case, Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail.[30]

Chevron argues that *Fawcett* squarely applies to this case because the contractual relationship between Chevron and the Trust, and between Chevron and third-party purchaser ONEOK, is identical to the contractual relationships in *Fawcett*.  As such, Chevron claims that the marketable condition rule was satisfied when gas was delivered at the wellhead to ONEOK in a condition acceptable to ONEOK, in a good faith transaction.  The Trust argues that *Fawcett*'s holding does not apply here because (1) the gas was not sold at the wellhead; (2) the gas was not marketed at the wellhead; and (3) unlike in *Fawcett*, the Trust here challenges Chevron's good faith and prudence in entering into the purchase agreements with ONEOK.   The Trust refers to these three arguments as *Fawcett*'s "appellate concessions" that were not made in this case and thus require this Court to deny the motion for summary judgment.

## IV.   Evidentiary Objections

Summary judgment evidence "must be submitted 'in a form that would be admissible at trial."[31]  Under Fed. R. Civ. P. 56(c)(2), a party may object on this basis—that the material "cannot be presented in a form that would be admissible in evidence."  Indeed, as the advisory committee notes to the 2010 Federal Rule amendments explain: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[32]  "The requirement is that the party submitting the evidence show that it will be

---

[30]*Id.* at 1042.

[31]*Brown v. Perez*, –F.3d–, No. 15-1023, 2016 WL 4501821, at *4 (10th Cir. Aug. 29, 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[32]Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

possible to put the information, the substance or content of the evidence, into an admissible form."[33]

### A.   Hearsay and Authentication

Chevron objects that many of the Trust's exhibits in opposition to summary judgment are unauthenticated and constitute hearsay, and thus should be excluded.  On summary judgment, affidavits "must contain certain indicia of reliability."[34]  "Information presented in the nonmovant's affidavit must be 'based on personal knowledge and [must set] forth facts that would be admissible in evidence.  We do not consider conclusory and self-serving affidavits.'"[35] With respect to hearsay, the Trust must make some showing that the substance of the evidence would be admissible at trial in an admissible form by either demonstrating that an exception applies, or that the declarant would testify to the document's contents.[36]  The Trust offers Exhibits 1-32 through the declaration of its counsel, Rex Sharp.[37]  He states at the outset that his statements are "based upon personal knowledge."  The Court overrules and denies objections pertaining to documents that are plainly business records given that they were produced during discovery.  The balance of the documents offered through Mr. Sharp, while not admissible in the form presented, are admissible under the business records exception to the hearsay rule, and may be authenticated by the custodians of records from Chevron, or ONEOK.  The objections to Exhibits 4, 5, 8, 16–21 are overruled.[38]

---

[33]*Perez*, 2016 WL 4501821, at *4 (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015)); *see O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

[34]*Ellis v. J.R's Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015).

[35]*Id.* (quoting *Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002)).

[36]*See Brown*, 2016 WL 4501821, at *4–5.

[37]Doc. 114-39, Ex. A.

[38] This does not mean that the Trust's asserted interpretation of these documents, some of which are technical, is admissible absent the testimony of a witness with personal or expert knowledge who is qualified to interpret the documents.

The Court agrees with Chevron however that certain exhibits must be excluded because the Trust, as the proponent of the evidence, has failed to demonstrate that a hearsay exception applies, or that it could otherwise be presented in a form that would be admissible at trial.  First, the deposition testimony from other cases attached as Exhibits 4 and 5 are inadmissible. Deposition testimony is governed by Fed. R. Civ. P. 32, and Fed. R. Evid. 804.  Rule 32 allows a party to use a deposition taken in another case if it involves the same subject matter between the same parties.[39]  Rule 804(b)(1) provides an unavailability exception to the hearsay rule where the witness "is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination."  The Trust has not shown that these witnesses were previously offered in a case involving Chevron such that it had an opportunity to develop it through a witness examination. The Court agrees that deposition testimony taken in a different case with different parties is inadmissible and should not be considered on summary judgment.[40]  For the same reasons, the Court excludes Exhibit 3, which is the trial testimony from a 2003 bankruptcy case by a representative for Enterprise Products Operating LP.  The Trust has failed to show that a hearsay exception applies to this testimony..

Second, the Court disregards as improper legal argument any attempt to use a legal opinion from another court as evidence in this case.  While the parties can litigate the weight that this Court should give to nonbinding authority outside of this circuit, it is wholly inappropriate for the Court to consider the ruling of another court as evidence in this case between different parties.  Chevron's objection to Exhibit 2 is sustained.

---

[39]Fed. R. Civ. P. 32(a)(8).

[40]*See Nichols v. Schilling*, No. 10-CV-64, 2011 WL 1630981, at *1 (E.D. Wis. Apr. 29, 2011) (citing *Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994); *Hughes v. City of Chicago*, 673 F. Supp. 2d 641, 651 (N.D. Ill. 2009)).

The Court also disregards as improper legal argument any attempted analysis by Mr. Sharp in his declaration about the documents he offers.  He provides no information that allows this Court to conclude such analysis could be presented in a form that would be admissible at trial.  He did not prepare the documents.  Instead, he provides his own self-serving interpretation of the evidence.[41]  The jury would be instructed at trial that such argument by an attorney is not evidence, so it is improper for the Court to consider it on summary judgment.  The Trust is free to argue in favor of its interpretation of the evidence in the argument section of the brief, but it may not introduce such analysis as evidence.  The Court therefore disregards Mr. Sharp's analysis in ¶¶ 5, 32, 34, 35, and 36 of his declaration.[42]  Additionally, all statements of argument, as opposed to fact, provided in fact sections of the brief are disregarded.[43]

The Court also excludes the Pate White Paper offered as Exhibit 11.  The Trust argues that Pate's article can be authenticated by ONEOK or by the publisher of the paper.  But there is no bates stamp on this paper indicating that ONEOK produced it, and even if the publisher could authenticate the article, it does not alleviate the hearsay problem.  The Trust offers this paper to support the factual assertion that "Midstream Services under gas gathering agreements do not become a non-service sale just by adding a title transfer clause or by labeling the contract a "purchase" agreement."[44]  It is therefore offered for the truth of the matter asserted.  There is no indication that Mr. Pate's statements were adopted by Chevron, so it is not the statement of a party opponent.  The Trust does not identify any other exception or exclusion to the hearsay rule

---

[41]While the production of the documents to Mr. Sharp pursuant to a subpoena imbues in him personal knowledge that they were produced by ONEOK and therefore true and correct copies, it does not follow that he has personal knowledge to testify about their significance, or how or why they were created.

[42]The Court accepts as true the statement in ¶ 33 about Mr. Noulles; Mr. Sharp's personal knowledge of this attorney's affiliation is apparent from his participation in the depositions referred to in this paragraph.

[43]Fed. R. Civ. P. 56(c)(4); D. Kan. R. 56.1(b), (d).

[44]Doc. 114 ¶ 12.

that would apply to this exhibit.  Therefore, while the document may be used as nonbinding secondary authority in support of the Trust's argument, it is inadmissible evidence under the hearsay rule.

The Trust offers Exhibits 16–19, which are draft versions of the 2014 Amended contracts between ONEOK and Chevron.  They are offered to show that Chevron "pushed" changes that would have changed what had been gathering agreements into purchase agreements without otherwise changing the substance of the parties' agreements.  Setting to one side whether this is a reasonable interpretation of these documents, the Court agrees that Mr. Sharp lacks foundation to attest to the meaning of these documents, and the Court cannot surmise from this record whether they would be admissible at trial.  While Mr. Sharp may have physically received these draft agreements during discovery, he has no personal knowledge of their genesis—which party proposed which changes and whether they were further negotiated or abandoned.  To the extent the changes were proposed by ONEOK, the Trust has failed to show that a hearsay exception would apply.

Exhibits 27 and 28 are lists of deposition questions for Mr. Bates, and a representative of DCP (a competitor third-party purchase/midstream processing company), from the *Pummill* case in Oklahoma state court.  The sets of questions were sent as attachments to emails from Richard B. Noulles, who apparently represented the defendant in that case.[45]  These exhibits are inadmissible hearsay and again, the Trust as the proponent of this evidence offers no basis for their admission.

In Exhibit 31, the Trust offers what it characterizes as "industry papers."  But this exhibit is a table that appears to compile statements made by various persons in the oil and gas industry

---

[45] *See* Doc. 114-9, Ex. 2 ¶ 33.

in other court filings, legislative hearings, 10-Ks and articles.  The Trust argues that these

"industry papers" "can likewise be authenticated based on the websites and 10-Ks, but even if

not, they are sufficient for an expert such as Mr. Reineke and Dr. Foster to rely upon them."[46]

Most of the documents quoted and referenced in this table were not otherwise offered by the

Trust as exhibits, and the Trust makes no showing that a hearsay exception applies.  Perhaps the

Trust intends to offer this as a summary governed by Fed. R. Evid. 901.  That rule applies to

"voluminous writings, recordings, or photographs that cannot be conveniently examined in

court."  Exhibit 31 compiles quotations from various sources that are not all offered as exhibits.

It does not appear that this would be an admissible summary given that it does not summarize

anything, much less voluminous materials that could not be conveniently examined in court.

Instead, the table extracts certain quotations out of primary source material that is beneficial to

the Trust's position, without context.  The Trust does not meet its burden of showing that this

exhibit could be presented in a form that would be admissible at trial.[47]

## B.    Relevance Objections

Chevron argues that the following exhibits attached to Exhibit A, Mr. Sharp's

declaration, should be excluded under Rule 401 because they are not relevant to the issues

presented by the motion for summary judgment: 2–5, 8, 11–23, 26–28 and 31–32.  The Court has

already excluded several of these exhibits as inadmissible hearsay.  As described in the

discussion about the *Fawcett* decision, the key inquiries here are how the marketable condition

rule applies to the lease language in this case, whether Chevron delivered gas to ONEOK in a

condition acceptable to ONEOK, whether the third-party contracts were good faith transactions,

---

[46]Doc. 138 at 3.

[47]Given the Court's ruling *infra* excluding Plaintiff's expert reports, this evidence could not be admitted through the experts either.

and whether Chevron fulfilled its implied duty of good faith and fair dealing to the Trust.[48]  The relevance objections turn on the degree to which other gas purchase contracts and gathering agreements between these parties with respect to other wells, and documents in other oil and gas cases, inform the analysis on the issues in this case.  Chevron argues that the Court should not consider the many documents offered by the Trust to show how other unrelated contracts are worded, handled, drafted, or negotiated because the only contracts at issue in this case are the Lambert leases and the four gas purchase agreements submitted by Chevron with its motion.  The Trust argues that other contracts between operators and third-party servicers, or drafts of contracts, are relevant to determining whether the sales agreements are merely a sham, in violation of the duty of good faith.

The Court sustains Chevron's objections with regard to other leases and draft agreements unrelated to the Evenson wells.  These contracts have no bearing on whether Defendant breached the lease in this case.  The sole claim at issue on the motion for summary judgment is the breach of lease claim as to the Lambert leases.  It is undisputed that the gas produced by those wells is processed by ONEOK pursuant to gas purchase agreements with Chevron.  The Court must only determine whether those agreements constitute good faith transactions under the standard set forth in the Uniform Commercial Code.[49]  The Trust has failed to show how these other contracts are relevant to that determination, particularly given the Court's reading of *Fawcett* that the quality or condition of the gas does not determine marketability.  The Court therefore sustains Chevron's relevance objections to Exhibits 15, 16, 17, 18, 19, 20, 21, 22, 23, and 32.  The Court likewise sustains Chevron's objections to Exhibits 8 and 26.

---

[48]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1042 (Kan. 2015).

[49]*See Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *4 (D. Kan. July 28, 2016).

Conversely, the Court finds that the objections should be overruled as to the exhibits that pertain to the Evenson wells.  The gathering agreements between the same parties or their successors that preceded the 2007 contracts and 2014 amendments that give rise to these claims are thus admissible, as are the plant statements because they implicate the particular gas production process in this case, i.e. the production process for gas produced by the Evenson wells.  The objections to Exhibits 12, 13 and 14 are overruled.

### C.      Motions to Exclude Declarations of Bates, Foster, and Reineke

### 1.      Standards

Lay opinion testimony is governed by Fed. R. Evid. 701, and is "limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[50]

In contrast, Rule 702 governs expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[51]

The Court has broad discretion in deciding whether to admit expert testimony.[52]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or

---

[50]Fed. R. Evid. 701.

[51]Fed. R. Evid. 702.

[52]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

unaccepted speculation."[53]   In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[54]   To determine reliability, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[55]   Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[56]   An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[57]   And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[58]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[59]   But "the gatekeeping inquiry must be tied to the facts of a particular case."[60]

---

[53]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[54]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[55]*BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[56]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[57]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[58]*Id.*

[59]*Daubert*, 509 U.S. at 593–94.

[60]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (quotations omitted).

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[61]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[62]  In this case, the parties do not request a hearing.  The Court has carefully reviewed the submissions filed with the motions and believes this review is sufficient to render a decision.

### 2.    Alan Bates

Initially, the Trust moved to exclude the Alan Bates declaration attached to Chevron's reply as inadmissible expert opinion testimony.  The Trust argued that Bates was not designated as an expert, that his opinion contradicts testimony he provided in another case, that he is not qualified to render the opinions in his declaration, and that his opinions are incorrect.  But the Court overrules and denies this motion because Bates is not being offered as an expert.  Expert testimony is testimony that requires specialized or technical skill and knowledge.[63]  In contrast, lay opinion testimony may be offered based on "observations that are common enough and require a limited amount of expertise, if any."[64]  Bates is offering lay opinion testimony that meets the standards set forth in Rule 701.  Bates states in the declaration that he is the Director of Project Development in the Mid-Continent Region for ONEOK Field Services Company, LLC. ("OFS").  He previously held the position of Director-Oklahoma Gas Supply for OFS, and held a similar position with respect to OFS's Kansas assets in recent years.  He is familiar with OFS's operations in Kansas and with its gas purchase contracts with Chevron.  The Court finds that Bates's opinion is based on his personal first-hand knowledge of OFS's operations, derived from

---

[61]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[62]*Id.*

[63]*James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216 (10th Cir. 2011).

[64]*Id.* (quoting *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995)).

his position there.[65]  While Bates may not have personal knowledge of the relationship between the Trust and Chevron, he can offer a lay opinion about the contractual relationship between his employer and Chevron.  His opinions are not based on scientific, technical, or other specialized knowledge; they are based on his personal knowledge of industry custom.  Bates's opinions are thus admissible under Rule 701.  The Trust's arguments about the substance of Bates's opinion go to the weight and not the admissibility of the evidence.

To the extent the Trust argues for the first time in the reply that its motion to exclude is based on the failure to timely disclose Bates as a *lay* witness, the Court denies the motion as well.  At the Trust's behest, the discovery in this case, and the facts addressed in the summary judgment motion, multiplied substantially after the initial motion was filed.  The Trust has clearly been on notice of Bates's role and the basis for his testimony, given counsel's references to his testimony in other cases in which he has been involved.  And the Trust had the opportunity to depose him during the Rule 56(d) discovery stay and opted to cancel that deposition.  Moreover, the Trust has been granted leave to file a summary judgment sur-reply to address this evidence.  There is no prejudice to the Trust by allowing Chevron to rely on this lay witness in the reply.

### 3.    Daniel T. Reineke and William G. Foster

The Trust offers Reineke and Foster as experts in opposition to summary judgment. Reineke is a petroleum engineer with over forty years of experience working in the oil and natural gas industry.  He has served as an operator, drilling engineer, and production engineer. He has experience operating wells and entering into oil and gas leases, as well as negotiating gathering, processing, and sales agreements.  He is familiar with all phases of the natural gas

---

[65]For the same reasons described in excluding certain statements in Mr. Sharp's declaration, the Court does disregard the statements in paragraph 11 of Bates's declaration about the meaning of "marketable" under *Fawcett*. Doc. 117, Ex. D ¶ 11.

production process.  Reineke provides explanations and opinions on the following issues: (1) how raw gas such as that extracted from the wells operated by Chevron is produced, what the physical characteristics and qualities of that raw gas are as it comes out of the well bore and the subsequent processes necessary to transform the raw gas stream (and the constituents therein) into products that are capable of sale in the commercial marketplace; (2) what constitutes a good faith sale; and (3) Chevron's method of paying royalties owing from the sale of products from the gas stream.

Foster is an economist and the President of Foster Economic Research; he has been an independent consultant in the energy field, with an emphasis on natural gas, for over forty years. Foster's expert report addresses the following issues: (1) whether raw gas is a marketable product at or near the well; (2) when gas and its constituent parts have been transformed into marketable products such that they can be bought and sold in the commercial marketplace; (3) whether title transfers in contracts that transfer title to the raw gas prior to the provision of midstream services constitute "good faith sales" as to the royalty owners; and (4) the four third-party purchase contracts between Chevron and ONEOK discussed in Chevron's motion for summary judgment.

Chevron moves to exclude these expert reports as follows: (1) Reineke's opinion that the gas that Chevron sold to ONEOK was not in marketable condition until after processing for residue gas and after fractionalization to achieve marketable NGL products; and (2) Foster's and Reineke's opinion that the Chevron gas contracts with ONEOK were not good faith sales because the gas was sold before being put into marketable condition.  The Trust argues that Foster and Reineke are unqualified to give opinions on the marketable condition of gas, and that their opinions on these issues contravene the court's holding in *Fawcett*.

The Court agrees with Chevron that these experts' opinions must be excluded because they plainly contradict the Kansas Supreme Court's holding in *Fawcett*.  As Judge Melgren recently stated in excluding the same expert opinions in a similar case, "*Fawcett* dictates that gas is in marketable condition if it is marketed in a good faith transaction."[66]  He concluded that "[t]hese opinions are conclusory and reverse the standard set forth in *Fawcett*."[67]  Accepting the challenged opinions in this case similarly would violate *Fawcett*, because it would require the Court to accept the opposite standard set forth in *Fawcett*—that there can be no good faith transaction before the gas is placed in marketable condition, which is defined by certain qualitative standards that can never be met at the wellhead.

In addition to contradicting the controlling law on the Trust's claims in this case, the experts' opinions also must be excluded because they are legal conclusions.  Fed. R. Evid. 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Still, "testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."[68]  Nor may an expert "state legal conclusions drawn by applying the law to the facts."[69]

---

[66]*Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *5 (D. Kan. July 28, 2016).

[67]*Id.* at *6.  While it is true that the initial expert reports in *Roderick* were prepared before the *Fawcett* decision, *see id.* at *5, their opinions submitted in this case post-*Fawcett* are not markedly different.  These experts disagree with the *Fawcett* court and insist raw gas cannot be sold in a good faith transaction until it is marketable, as defined by certain qualitative standards.   They opine here, as they did in *Roderick*, that the gas must meet certain objective criteria to constitute a good faith sale in the commercial marketplace.  The Court also notes that the parties in *Roderick* were allowed supplemental briefing after the *Fawcett* decision, and that the plaintiff's supplemental brief included Foster's supplemental declaration regarding his opinion on good faith sales.  And, XTO filed a separate motion for summary judgment on the marketable condition rule after *Fawcett*. The initial brief was filed on November 13, 2015; the response was filed on January 13, 2016; the reply was filed on February 16, 2016, well after the *Fawcett* decision was issued.  *See Roderick*, No. 08-1330-EFM-GEB, Docs. 353–54, 357-1, 370–71, 404.

[68]*Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc).

[69]*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003).

It is clear to the Court that the experts in this case simply disagree with the *Fawcett* decision.  A few examples illustrate the blatant contradictions and conclusory assertions of law.  First, despite the fact that Kansas law clearly recognizes a category of oil and gas leases—*Waechter* leases—that are based on proceeds "from the sale of gas as such at the mouth of the well where gas only is found" or "if sold at the well," the experts opine that gas can never be sold or marketed at the well.[70]  While it is true that "[w]hat it means to be marketable remains an open question, . . . the answer is not simply, as Fawcett would have us hold, interstate pipeline quality standards or downstream index prices."[71]  In fact, the court observed that none of the cases upon which it based its decision contained a "discussion of a precise quality or condition at which gas becomes 'marketable.'"[72]

Second, Foster states his understanding of *Fawcett* as requiring the operator to "enter into a 'good faith sale' of gas in marketable condition."[73]  But this is not what *Fawcett* holds.  *Fawcett* provides that "the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[74]  Similarly, Reineke opines that even if a sale of gas occurs at the wellhead or gathering inlet, "a good faith market sale cannot be completed until the gas is in marketable condition at the market, which in this case, as demonstrated by all of the gas contracts, the gas quality, and the need for the Midstream Services, is at the Index pool for residue gas and OPIS Conway for NGLs."[75]  The experts opine that a factual determination of whether the gas is "marketable" informs the good

---

[70]*Fawcett*, 352 P.3d at 1039; *Waechter v. Amoco Prod. Co.*, 537 P.2d 228, 230 (Kan. 1975); Reineke Report, Doc. 114-40, Parts IIC.1, D, III.A; Foster Report, Doc. 114-37 at 3, 7.

[71]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1042 (Kan. 2015).

[72]*Id.*

[73]Foster Report, Doc. 114-37, at 2.

[74]*Fawcett*, 52 P.3d at 1042.

[75]Doc. 114–40, Reineke Report at 17.

faith analysis.  As already discussed, this is a misreading of *Fawcett*.  This misreading of

*Fawcett* dictates the experts' ultimate opinions that the gas purchase contracts in this case cannot

be good faith sales because they do not constitute a sale of what they deem to be "marketable

products"—raw gas prior to gathering and processing.  But again, these opinions conflict with

governing Kansas law, which this Court is bound to follow.

This Court is bound to apply governing Kansas law to the Kansas breach of lease claim in

this matter.  The *Fawcett* decision clearly holds, under quite similar facts, that gas may be sold

and marketed at the wellhead, and that if it is sold at the wellhead in a condition acceptable to the

purchaser in a good faith sale, it has satisfied the marketable condition rule.[76]  The court also

explained that there may be circumstances where the Trust can show that the third-party

purchase agreement was a bad faith transaction, or where the operator violated its implied duties

of marketability or of good faith and fair dealing.[77]  To accept the expert opinions in this case

would be to accept the proposition that no third-party purchase agreements at the wellhead could

ever be made in good faith.  While the Kansas Supreme Court did indeed leave open what

circumstances would constitute a breach of good faith, it did not contemplate that *all* wellhead

sales agreements would violate the implied duties.  In light of the governing law in Kansas, the

Court must exclude both expert opinions under Rule 702 and *Daubert*.

## V.      Uncontroverted Facts

In considering the parties' factual submissions, the Court excludes the evidence described

above that could not be presented in admissible form at trial, and disregards all factual assertions

that constitute legal argument by counsel, or are not supported by specific citations to the record.

---

[76]*Fawcett*, 52 P.3d at 1042.

[77]*Id.*

What remains are the following facts that are uncontroverted for purposes of summary judgment, and viewed in the light most favorable to the Trust as the nonmoving party.

One of the Chevron Defendants, Four Star, is the lessee by assignment under a September 8, 1944, Oil and Gas Lease of approximately 320 acres in Seward County, Kansas; Lambert is the lessor under the lease, by deed acquisitions dated December 7, 1965 (1/2 mineral interest) and November 5, 1985 (100% mineral interest) ("Lambert Lease"). The Lambert Lease's royalty provision states:

> Lessee shall pay lessor monthly as royalty: (a) on gas marketed from each well, one-eighth (1/8) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then, one-eighth (1/8) of the market value thereof at the well.[78]

Under the Lambert Lease, the Trust has an interest in only two Chevron-operated wells: the Evenson #1 and #2 wells, both in Seward County, Kansas. There are no provisions in the Lambert lease for deductions required to make the gas acceptable to purchasers.

From May 2007 to the present, all gas produced from the Evenson #1 and #2 wells was subject to Gas Purchase Agreements between Chevron and ONEOK. These agreements define ONEOK as the buyer and Chevron as the seller. They state that "BUYER desires to purchase and SELLER desires to sell" gas specified in the contracts that include the Evenson wells.[79] "Title, possession and control of SELLER's Gas and all Condensate and Plant Products contained therein shall pass from SELLER to BUYER at the Receipt Point(s)."[80] "Receipt Point(s)" are defined in the 2007 agreements as "the inlet flange of BUYER'S or BUYER'S

---

[78]Doc. 41, Ex. A-1 ¶ 4.

[79]Doc. 44, Ex. 2 at CHLT0009473; Ex. 3 at CHLT0010298; Ex. 4 at CHLT0050501; Ex. 5 at CHLT0050477.

[80]*See* Doc. 44, Ex. 2 ¶ 1.4; Ex. 3 ¶ 1.4; Ex. 4 ¶ 4.4 (amendment adds the language "including all combustible, noncombustible, and inert elements, and all compounds"); Ex. 5 ¶ 4.4 (same).

designee's pipeline facilities installed to take deliveries of Gas from SELLER."[81]   The 2014 agreements define the term similarly: "the inlet flange of BUYER's, or BUYER's designee's Facility(ies) installed to take receipt of Gas from SELLER, as described in Exhibit "B" attached hereto, and made a part hereof."[82]   Exhibit B provides a list of wells that the seller "dedicates to this Gas Purchase Agreement," that includes the Evenson wells.   The agreements contain certain quality specifications for the gas delivered at the receipt points, as well as force majeure clauses.

Each of the four agreements contains an Exhibit A that sets forth the details of consideration, including a breakdown of proceeds, fees and charges.   The buyer is to pay to the seller natural gas liquids payment based on a percentage of net Natural Gas Liquids and net residue proceeds, less certain fees such as a gathering and compression fee, a third-party fee, and a plant fuel fee.   The proceeds due under the contract are based on the value received by the sale of the gas by the buyer, net costs and fees incurred.   The Trust's royalty was calculated based on a percentage of these proceeds.

ONEOK is not related to, nor affiliated with, any Chevron entity.   The 2007 ONEOK gas purchase agreements and the 2014 ONEOK gas purchase agreements are arms-length agreements negotiated by representatives of Chevron's commercial department and ONEOK.

At all times from 2007 to present, the gas delivered to ONEOK under the gas purchase agreements was in a condition acceptable to ONEOK.   ONEOK accepted the gas and paid Chevron the proceeds.   No costs were assessed to the Trust or deducted from the Trust's royalty payments to meet ONEOK's requirements as to the quality of the gas at the time and place of delivery.

---

[81] *See* Doc. 44, Ex. 2 ¶ 16.1.23; Ex. 3 ¶ 16.1.23.

[82] *See* Doc. 44, Ex. 4 ¶ 3.1.26; Ex. 5 ¶ 3.1.26.

The 2007 agreements explicitly terminated "any prior agreements for the sale of gas between the parties or their predecessors in interest concerning any gas produced from any sources covered by this Agreement described in Exhibit 'B.'"  Each contract listed a Gas Gathering Agreement dated September 23, 1996, and a Compression Agreement, dated May 1, 2001, in this section.[83]  The Gathering Agreements were entered into between Enron Gathering, L.P. (ONEOK's predecessor in interest) and Texaco Exploration and Production, Inc. (Chevron's predecessor in interest) and applied to the Evenson wells.  Under these agreements, the gatherer (Enron) received natural gas from the shipper (Texaco) at "valid receipt Point(s)" and delivered "thermally equivalent volumes of such gas, for the account of Shipper at valid Delivery Point(s)."  The contracts required the third-party to connect the wells at its expense.  Title did not pass to the third-party servicer under these contracts; instead, they included provisions governing risk of loss based on which party possessed the gas.  The contracts included force majeure clauses.

At all time since December 1, 2009, Kansas has imposed a regulatory fee on operators of oil and gas wells known as a Conservation Fee.  Between December 23, 2009, and September 30, 2012, Chevron deducted Conservation Fees from the Trust.  Beginning in production month October 2012, Chevron ceased taking any further deductions from royalty for Conservation Fee payments Chevron made to the Kansas Corporation Commission ("KCC").  On or about March 28-30, 2016, Chevron affected accounting credit to all royalty owners in Kansas wells who had a conservation fee deducted from royalties from May 2009 to September 2012, including the Trust.

The reimbursements to royalty owners, including the Trust, were included in their

---

[83]Doc. 44, Ex. 2 ¶ 18.13; Ex. 3 ¶ 18.13.

monthly royalty checks where applicable.  The Trust's check was sent on March 30, 2016 to its current address.  There was no notice provided, or other accounting, that conveyed to the Trust that its royalty check included the conservation fee credit.  Counsel for Chevron forwarded the check detail to counsel for the Trust by email on April 5, 2016.  On April 11, 2016, Mr. Sharp emailed counsel for Chevron and asked for more detail on how it had calculated the Conservation Fee refund, and where the interest calculation was reflected on the check detail. On April 12, Chevron's counsel responded with the specific code on the check detail for the interest paid.  The Trust's check cleared effective May 4, 2016.  On May 5, 2016, Chevron's counsel provided further information to the Trust's counsel about the back payments of conservation fees to other Kansas royalty owners.

The total amount of conservation fee reimbursement paid to the Trust was $92.97. Chevron also paid interest on the refunded conservation fee calculated on a monthly basis during the refund period at the rate of 10%.  The total amount of interest paid to the Trust was $48.29. The total amount of conservation fees and interest to Kansas royalty owners was $11,863.56.

## VI.     Discussion

### A.      Marketable Condition Rule

As described earlier in this Order, the Trust's response to the *Fawcett* decision hinges on its claim that there were three "appellate concessions" in *Fawcett* not made in this case that distinguish the Kansas Supreme Court's holding and render it in applicable here: (1) the gas here was not sold at the wellhead; (2) the gas here was not marketed at the wellhead; and (3) unlike in *Fawcett*, the Trust here challenges Chevron's good faith and prudence in entering into the purchase agreements with ONEOK.  The Court does not agree with the Trust that these "appellate concessions" distinguish the facts of this case from *Fawcett*.  Based on the

uncontroverted facts of this case, the marketable condition rule was satisfied because the *Waechter* leases provided for a sale of raw gas at the well, the gas was marketed at the well, and the gas was delivered in a condition acceptable to ONEOK in a good faith transaction. Moreover, the Trust has failed to point this Court to case-specific evidence that creates a genuine issue of material fact about whether Chevron breached its implied duty of good faith and fair dealing under the lease.

### 1.     Geography of the Sales and Royalty Calculations

The Trust argues that the rule announced in *Fawcett* does not apply here because the gas was neither sold nor marketed at the well.  In order to determine the geography of the sale of gas, and of the royalty computations, Kansas courts look to the royalty language in the lease.[84] Although the geography of the sale is a question of fact, "the geography of royalty calculations turns on the lease language, the interpretation of which is a question of law for the Court."[85]  The undisputed language of the Lambert Lease states: "Lessee shall pay lessor monthly as royalty: (a) on gas marketed from each well, one-eighth (1/8) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then, one-eighth (1/8) of the market value thereof at the well."[86]  Despite the fact that this lease language is almost identical to the lease language in *Fawcett* and *Waechter*, which base royalties on a share of proceeds at the well,[87] the Trust urges that had the plaintiff in *Fawcett* challenged this assumption, the result would have been different. The Court disagrees.

---

[84]*Fawcett v. OPIK*, 306 P.3d 318, 321–22 (Kan. Ct. App. 2013), *rev'd on other grounds*, 352 P.3d 1032 (Kan. 2015); *Smith v. Amoco Prod. Co.*, 31 P.3d 58, 77 (Kan. 2001); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788, (Kan. 1995).

[85]*Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM, 2016 WL 4039641, at*8 (D. Kan. July 28, 2016).

[86] Doc. 41, Ex. A-1 ¶ 4.

[87]*Fawcett*, 306 P.3d at 1039 ("The lease language required OPIK to pay Fawcett a fractional share of its proceeds 'from the sale of gas as such at the mouth of the well where gas only is found' or 'if sold at the well.'"); *Waechter v. Amoco Prod. Co.*, 537 P.2d 229 (Kan. 1975)); *Roderick*, 2016 WL 4039641, at*7–8.

The Kansas Court of Appeals found that the *Fawcett* leases were *Waechter* leases, and found "the gas was sold at the well and that the leases require royalty payment based on the proceeds from wellhead sales with no provisions for deductions or adjustments from gas sale contracts."[88]   The court of appeals panel also found that the term "proceeds" as used in the *Fawcett* leases "means the money OPIK would have received under the third-party purchase agreements without the deductions specified in those agreements."[89]   Although the parties did not challenge these findings on appeal to the Kansas Supreme Court, the Trust here cannot show that the Kansas Supreme Court would have disagreed with the Court of Appeals' finding that the gas was sold at the well, and that the proceeds should be calculated at the well.   The decision was based on the lease language, which is almost identical to the lease language in this case, and on an extensive discussion of Kansas law.[90]

And, like the purchase agreements in *Fawcett*, the purchase agreements in this case provide that "Title, possession and control of SELLER's Gas and all Condensate and Plant Products contained therein shall pass from SELLER to BUYER at the Receipt Point(s)."[91]   The receipt point is defined as the inlet flange for the gas identified in Exhibit B, which in each contract references the Evenson wells and their meter numbers.   Transfer of title happens at the receipt point in exchange for consideration to be paid according to the pricing formulas set forth in Exhibit A to each contract.   The Court agrees with Chevron that the transfer of title represents

---

[88]*Fawcett*, 306 P.3d at 1037 (discussing 306 P.3d 318, 321–22 (Kan. Ct. App. 2013)).

[89]*Id.* (discussing 306 P.3d at 324); *see also Hockett v. Trees Oil Co.*, 251 P.3d 65, 72 (Kan. 2011).

[90]*Id.* at 1039 (discussing the lease language); 306 P.3d at 324; )); *see also Roderick*, 2016 WL 4039641, at*7 ("The Kansas Court of Appeals found that under a *Waechter* lease, when gas is sold at the well, royalties are to be based off of the proceeds of that wellhead sale. This is well settled law. When gas is sold at the wellhead pursuant to a *Waechter* lease, the royalty owner is entitled to no more that his proportionate share of the amount actually received in the sale.").

[91]*See* Doc. 44, Ex. 2 ¶ 1.4; Ex. 3 ¶ 1.4; Ex. 4 ¶ 4.4 (amendment adds the language "including all combustible, noncombustible, and inert elements, and all compounds"); Ex. 5 ¶ 4.4 (same).

the point of sale.  The Court further agrees that Kansas law has recognized that raw gas can be sold at the wellhead,[92] so the Trust's argument that there is no market for gas at the well is unavailing.

### 2.      Acceptable to the Purchaser in a Good Faith Transaction

When the gas is sold and marketed at the well, the marketable condition rule as set forth in *Fawcett* requires that it be acceptable to the purchaser when delivered.  The uncontroverted evidence establishes that ONEOK desired to purchase raw gas, that the gas was accepted by ONEOK, and that no deliveries were rejected nor costs imposed for failure to meet certain qualitative standards set forth in the purchase agreements.

The Trust urges that the gas in this case was not marketable at the well based on counsel's inadmissible comparison of gas analysis for the raw gas sold to ONEOK to the standards in the gas purchase contracts, which he claims shows that it did not meet the quality standards set forth in the gas purchasing contracts.  The Trust also relies on excluded expert reports concluding that there is no market for raw gas at the mouth of the well.  Like the contract in this case, the OPIK contract in *Fawcett* contained quality requirements, and the third-party purchasers had the right to either refuse delivery or accept the gas and deduct treatment costs if needed.[93]  Like *Fawcett*, there is no evidence that costs were ever assessed or deliveries were refused because the gas in this case did not meet the quality specifications in the third-party sale contracts.  Moreover, as Judge Melgren recently explained, the requirement that gas be acceptable to the purchaser "requires only that the gas be 'in a condition to be sold.'  The fact

---

[92] *Fawcett*, 352 P.3d at 1035, 1039 (acknowledging that raw gas requires processing to transform it into pipeline-quality gas, and that some of this processing occurs at the wellhead and some occurs away from it; rejecting Fawcett's claim that "raw natural gas sold at the well is not marketable as a matter of law or fact until it is processed"); *see also Waechter*, 537 P.2d at 249; *Gilmore v. Superior Oil Co.*, 388 P.2d 602, 606 (Kan. 1964).

[93] *Fawcett*, 352 P.3d at 1036.

that ONEOK accepted all of the gas demonstrates that it was in acceptable condition."[94]  There is

no genuine issue of material fact about whether the gas was acceptable to ONEOK when it was

delivered.

Having concluded that there is no genuine issue of material fact about whether the gas

was sold and marketed at the wellhead, or whether the gas was acceptable to the purchaser when

it was delivered, under *Fawcett* the Court must finally consider whether the gas purchase

contracts were good faith transactions.[95]  Since a gas purchase agreement is considered a sale of

goods under Kansas law, the Uniform Commercial Code ("UCC") applies.[96]  Under the UCC,

good faith "means honesty in fact and the observance of reasonable commercial standards of fair

dealing."[97]  The UCC comment to this definition explains:

> [T]he definition of "good faith" in this section requires not only honesty in fact
> but also "observance of reasonable commercial standards of fair dealing."
> Although "fair dealing" is a broad term that must be defined in context, it is clear
> that it is concerned with the fairness of conduct rather than the care with which an
> act is performed.  This is an entirely different concept than whether a party
> exercised ordinary care in conducting a transaction.  Both concepts are to be
> determined in the light of reasonable commercial standards, but those standards in
> each case are directed to different aspects of commercial conduct.[98]

As the Trust correctly notes, a determination of good faith is a question of fact.[99]

Chevron comes forward with uncontroverted evidence that the gas purchase agreements

were arm's length agreements between two unaffiliated companies.  The Trust challenges this

---

[94]*Roderick*, 2016 WL 4039641, at*7.

[95]Similar to *Fawcett* and *Roderick*, Plaintiff does not challenge the price that Chevron received for the gas. Therefore, as Judge Melgren explained, the prudent operator standard does not apply and instead the Court focuses only on whether there was a sham sale, as urged by Plaintiff.  *Id.* at *4.

[96]K.S.A. § 84-2-102; *Sunflower Elec. Co-op, Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 769 (Kan. Ct. App. 1981).

[97]*Id.* § 84-1-201(20); *see also Roderick*, 2016 WL 4039641, at *6 (applying the UCC under similar facts).

[98]K.S.A. § 84-1-201(20) cmt.

[99]*See, e.g.*, *Roderick*, 2016 WL 4039641, at *4.

evidence by arguing that they are "sham sales," "paper title transfers," or "pre-market sales" designed solely to avoid Chevron's duty to market and prepare the raw gas for market.  As with its wellhead sale argument, the Trust's good faith argument relies on the generalized premise that no third-party purchase agreement at the wellhead could be a good faith transaction.  The Court rejects this generalized argument and finds no case-specific evidence that creates a genuine issue of material fact about good faith in this case.  The Trust presents no evidence that the parties in this case conspired or colluded to evade the marketable condition rule, or that the purchase agreements were not executed in good faith.

Chevron has submitted evidence from a ONEOK representative that the 2007 and 2014 gas purchase agreements are representative of agreements routinely used by both ONEOK and Chevron.  Bates, who is familiar with ONEOK's operations in Kansas and with its contracts with Chevron, states that his employer "routinely purchases natural gas at the wellhead or other field locations under percentage of proceeds ("POP") and percentage of index ("POI") contracts in Kansas."[100]  He contends that the gas purchase contracts in this case "are similar to other contracts that OFS frequently has entered into with other producers in Kansas and Oklahoma."[101]  Based on his experience, he opines these contracts were consistent with reasonable and customary commercial standards in the industry.  The Court also notes that the third-party purchase agreements in *Fawcett* were almost identical to the contracts in this case.  In *Fawcett*, "third-party purchasers pay OPIK for the raw gas received at the wellhead based on a percentage of specified index prices or the third-party purchasers' actual revenue when that gas is sold to others, reduced by certain costs."[102]

---

[100]Doc. 117-2, Ex. D ¶ 5.

[101]*Id.* ¶ 8.

[102]*Fawcett*, 352 P.3d at 1036.

The Trust argues that marketability requires the gas to be of a quality that can be sold "at the ordinary price in a recognized market."  It contends that the mere fact that it is capable of sale is insufficient; raw gas is incapable of sale before full GCDTP services can be performed and the products are sold downstream.  These are the same assertions in the Trust's expert reports, which this Court has excluded as contrary to controlling Kansas law.  For the same reasons it excluded those opinions, the Court cannot find that this argument negates the good faith element of marketability set forth in *Fawcett*.  The Trust's argument turns the holding of *Fawcett* into a circular analysis: the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction, but it can only be a good faith transaction if it is marketable.  Accepting the Trust's argument would also write out of *Fawcett* its rejection of the claim that the gas must be in a certain physical condition to be sold in the commercial marketplace.[103]

The Trust has offered many other contracts between Chevron and ONEOK, and between other parties, to support its claim that these third-party purchase agreements violate commercially reasonable standards of good faith in the industry.  The Court has excluded draft and executed contracts unrelated to the wells in this case as not relevant to the good faith of these specific transactions.  The Trust offers the gathering agreements that preceded the gas purchase agreements between ONEOK and Chevron as to the Evenson wells.  The Trust argues that the gathering agreements used in the past accomplish the same services as the gas purchase agreements, and that the "paper title transfers" in the gas purchase agreements have no effect other than allowing Chevron to share the processing expenses with the royalty owners.  But there is nothing in the gathering agreements, draft agreements, or predecessor agreements that make

---

[103]*Fawcett*, 352 P.3d at 1042 (rejecting that standard as contrary to Kansas law), and 1040 ("We disagree with Fawcett's equating 'marketable condition' with interstate pipeline quality.").

this clear, or allow such an inference.  The purchase agreements provide for title transfer at the receipt points; the gathering agreements did not.  There is no evidence that operators and purchasers began to execute purchase agreements instead of gathering agreements to explicitly avoid the marketable condition rule, other than the conclusory statements of the Trust's experts, which this Court has excluded.  Indeed, the original 2007 contracts at issue here predate the *Fawcett* decision.

The Trust also offers revisions to the 2014 amended contracts between Chevron and ONEOK, claiming that they evidence Chevron "pushing" changes that would convert the agreements into purchase agreements without changing the substance of the contracts.  However, these amended agreements replaced the 2007 purchase agreements, not the earlier gathering agreement.  There was no reason to push "purchase agreement" language into amendments to a purchase agreement.  Second, the Court excluded these documents under the rule against hearsay, and because there is no foundation for these revisions.  It is purely conclusory, in the absence of evidence from ONEOK or Chevron, to speculate (a) that these were changes proposed by Chevron; and (b) the purpose of the changes beyond the plain meaning of the fully executed contracts.  The Trust points to nothing about the facts surrounding the specific transactions in this case, which call their good faith into question.  Instead, the Trust posits that raw gas can never be sold at the wellhead in a good faith transaction.  Under *Fawcett*, the Trust must come forward with specific evidence about the transactions in this case to create a genuine issue of material fact on good faith.[104]

---

[104]Plaintiff relies heavily on an Oklahoma state district court's decision on summary judgment in *Pummill v. Hancock Expl. LLC*, No. CV-2011-82 (Feb. 9, 2016) (attached as Doc. 114-4).  This decision carries no weight with this Court.  First, it interprets Oklahoma and not Kansas law.  For this reason, the *Pummill* court declined to acknowledge that the *Fawcett* decision was even persuasive to the facts of that case.  Second, the *Pummill* court found that the rule in *Fawcett* did not apply to a Defendant's counterclaim requesting some sort of declaratory judgment that gas from the well at issue is a marketable product at the custody transfer meter.  Finally, there was evidence in that case that the gas from the single well at issue was not marketable because it was not capable of

The Trust's argument that the purchase agreements are a sham is not specific to the purchase agreements in this case. It depends on a finding by this Court that all such purchase agreements are a sham, despite the court's acknowledgement in *Fawcett*, that "most natural gas produced in Kansas is sold under formula-based purchase agreements similar to those in this case."[105] Instead, the Court focuses on evidence concerning the fairness of the conduct between the parties in these specific transactions—when the four gas purchase agreements were executed in 2007 and 2014. In these agreements, Chevron is listed as a seller and ONEOK is listed as a buyer. They are unaffiliated parties and the contracts were negotiated at arm's length. ONEOK considers the agreements to be fair and reasonable and typical of the industry. Chevron sold all gas from the Evenson #1 and #2 wells to ONEOK at a designated receipt point at or near the wellhead in exchange for a percentage of revenue from the sale of natural gas and NGLs recovered from the raw gas, less an amount used for processing, such as for gathering and compression. Title transferred to ONEOK at the receipt points and the buyer has total dominion and control over the gas once that title transfer occurs. At all times between 2007 and the present, ONEOK accepted the gas without requiring additional costs to meet quality standards set forth in the contracts. Given this uncontroverted evidence, the Court cannot find a genuine issue of material fact exists about whether the gas purchase agreements between these parties were executed in good faith.

---

entering the gathering line where it was sold. *Id.* at 70–71. There is no such admissible evidence in this case, and even if there was, it would violate the rule announced in *Fawcett* to hold that GDCTP services are required before gas can be marketable.

[105] *Fawcett*, 352 P.3d at 1034. Plaintiff argues that even if these are considered true sales, because the same gas could have been sold at the "actual market" for the highest and best price for the mutual benefit, using a gathering and processing agreement, rather than a sales agreement, the contracts violate the "mutual benefit rule." Plaintiff cites *Fawcett*'s recitation of the ordinary prudence rule, which this Court has already explained would apply if Plaintiff had objected to the price received from ONEOK, which it does not. Under that standard, the best possible price would mean "best prices obtainable at the place where the gas was produced." *See Roderick*, 2016 WL 4039641, at *6 (quoting *Smith*, 31 P.3d at 258). Roco has made no showing in this case that DCP failed to obtain the best possible price that could be obtained at the points of sale at issue in this case.

### 3.      Good Faith and Fair Dealing

In addition to challenging the good faith of the transactions between Chevron and ONEOK under the marketable condition rule, the Trust argues that Chevron breached the implied duty of good faith and fair dealing it owes to the Trust under the lease by entering into the third-party purchase agreements in this case.  In *Fawcett*, the court acknowledged that under its formulation of the marketable condition rule, there is potential for "mischief given an operator's unilateral control over production and marketing decisions."[106]  The court stated that the royalty owners' interests were adequately protected by the operator's implied covenant of good faith and fair dealing and implied duty to market.  Because the lessors in *Fawcett* did not challenge whether the duty of good faith and fair dealing was met, the court did "not dwell further on what this might entail."[107]

Under Kansas law,

Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. . . .  [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.  However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.[108]

---

[106]*Fawcett*, 352 P.3d at 1042.

[107]*Id.*  The Kansas Supreme Court remanded the case back to the district court after reversing the court of appeals on the implied duty of marketability issue.  *Id.*  On remand, the trial court granted summary judgment on the remaining issue of good faith and denied the class plaintiffs' motion to amend the complaint.  Doc. 117, Exs. G4–G5.

[108]*Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013) (quoting *Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987)).

This requires a case-specific inquiry.  The Court does not read *Fawcett* as creating a new rule or duty involving good faith and fair dealing between a lessor and lessee.  Instead, the preexisting duty of good faith and fair dealing was sufficient in the court's mind, along with the implied duty of marketability, to protect royalty owners from an operator's bad faith conduct in making production and marketing decisions.  This Court does not read *Fawcett* as contemplating a result whereby a plaintiff only must demonstrate that an operator sells gas to a third-party purchaser before the gas reaches the interstate pipeline to create a triable issue on the duty of good faith and fair dealing, despite fulfilling the marketable condition rule.  The Trust must demonstrate some evidence specific to these parties to create a genuine issue of material fact on the implied duty.  Because all of the Trust's good faith and fair dealing arguments assert a generalized grievance about these third-party contractual arrangements, summary judgment is appropriate in favor of Chevron.  Nonetheless, the Court addresses the Trust's specific arguments below.

First, the Trust argues that reducing the royalty payments based on net proceeds cannot constitute good faith because the fruits of the lease were to be paid for all valuable minerals that came out of the well.  The Trust's argument that it has not received proceeds on all minerals because drip condensate and helium are excluded is without evidentiary support.  Actual proceeds on which Chevron calculated royalties was based on consideration under the gas purchase contracts for "all components" in the raw gas stream.  Defendant submitted Morby's declaration that Chevron paid Lambert royalty based on its proportionate share of total proceeds for all gas and its components, as measured at the wellhead.  This would include drip condensate and helium.  Moreover, the duty of good faith and fair dealing cannot supply new contract terms to a contract.; it grows out of the existing terms.[109]  The lease requires that a royalty be paid on

---

[109] *Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1244 (D. Kan. 2006) (quoting *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1243 (D. Kan. 2003)).

"proceeds" of gas sold at the well.  According to Morby's affidavit, no costs were assessed to the Trust or deducted from royalty payments to meet ONEOK's requirements as to the quality of the gas sold.

Second, the Trust argues that Chevron failed to inform the royalty owners that they were liable for midstream service costs under these purchasing agreements, in breach of the duty of good faith and fair dealing.  In support of this argument, the Trust cites *Bank of America v. Narula*, a commercial mortgage foreclosure case where a lender was found in breach of the duty of good faith and fair dealing on a loan agreement, and in breach of its fiduciary duty to the borrowers, where the bank failed to advise and inform the borrowers that they would be personally responsible for certain fees.[110]  The Court does not find *Narula* controlling or helpful on the question of good faith on these facts.  First, *Narula* was an appeal from a district court's findings of fact and conclusions of law after a bench trial.  It merely determined that substantial competent evidence supported the trial court's finding that the bank breached its implied duty in three different ways.[111]  Second, the subjective dishonesty and intentional deception involved in the loan modification agreement at issue in *Narula* was between the signatories to that agreement—whether the bank had disclosed details about the loan agreement to the borrowers, or instead actively concealed information about the agreement that would have caused the borrowers not to sign the agreement.[112]  Here, there is no allegation that Chevron deceived the Trust during the course of executing their lease agreement.  And even if *Narula* did have some application to the third-party purchase agreements in this case, there is no evidence that Chevron hid from the Trust midstream services for which it would become "personally liable" to

---

[110]261 P.3d 898, 917 (Kan. Ct. App. 2011).

[111]*Id.*

[112]*Id.*

ONEOK.  Under the applicable UCC definition that applies to the duty of good faith in this case, the Court does not find a genuine issue of material fact exists about whether the duty of good faith was breached by Chevron not revealing the details of its third-party purchase agreements to the Trust.  The Trust points to no obligation under the terms of the lease, or under the law, that would require Chevron to reveal or discuss the details of their third-party purchase agreements with the Trust.

Finally, the Trust argues that Chevron breached the duty of good faith and fair dealing by "exercising its discretion to recapture foregone opportunities," citing two law review articles in support.[113]  Again, the Trust argues that Chevron and ONEOK created sham title transfer agreements in order to hide costs and take deductions that they would not otherwise be able to take under a gathering agreement.  The Court is not persuaded that this "foregone opportunity" theory has been embraced by Kansas good faith law.  Again, under this Court's reading of *Fawcett*, it was not improper as a matter of law for Chevron to calculate and pay royalties based on the actual gross proceeds received from its wellhead sales instead of downstream index prices, so long as any incorporated costs were incurred post-sale.  And as already discussed, the Court will not impose a heightened duty upon a lessee to calculate proceeds differently than what is called for under the terms of the contract.

In sum, Chevron has demonstrated an absence of evidence that the third-party purchase agreements in this case violated either the implied duty of marketability or the implied duty of good faith and fair dealing.  The Trust has failed to come forward with evidence that would be admissible at trial that would create a genuine issue of material fact as to these issues. Summary judgment is therefore granted to Chevron on the marketable condition claim.

---

[113]Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 373 (1980); Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 Duke L.J. 879, 893 n.11 (Nov. 1988).

## B.        Conservation Fee

The First Amended Class Action Complaint, filed February 8, 2016, after Chevron's

motion for summary judgment was filed, alleged for the first time that the Conservation Fee had

been wrongfully deducted from Kansas royalty owners' payments:

> As to the Kansas portion of the class only, Defendants for years improperly
> deducted or allowed reduction of royalty payments for a royalty owner share of
> the Kansas Conservation Fee which by law is imposed only on operators, not
> royalty owners. Defendants kept the money and never has [sic] repaid it, with
> interest, in accordance with the law.[114]

Defendant does not dispute that the conservation fee was wrongfully deducted from these royalty

payments.[115]

On or about March 28-30, 2016, before the Trust had responded to the summary

judgment motion, Chevron affected accounting credit to all royalty owners in Kansas wells who

had a conservation fee deducted from royalties from May 2009 to September 2012, including the

Trust.  The reimbursements to royalty owners, including the Trust, were included in their

monthly royalty checks where applicable.  But there was no notice or accounting that put the

recipients on notice that the checks included reimbursement for the conservation fees.  The

Trust's check was sent on March 30, 2016 to the Trust's current address.  Chevron's counsel

providing accounting code information and a check statement after the Trust cashed the check.

In the reply memorandum, Chevron argues that its payment of the conservation fee

renders this claim constitutionally moot.[116]  Article III of the Constitution gives federal courts the

---

[114]Doc. 90 at 10.

[115]*See Hockett v. Trees Oil Co.*, 251 P.3d 65, 71 (Kan. 2011).

[116]The Trust attempts to argue that Chevron waived this argument by not raising it in the original motion, or by not filing a separate motion for summary judgment after Plaintiff had been allowed leave to amend.  The Court disagrees.  Mootness is jurisdictional and can be raised at any time.  *See, e.g.*, *Colo. Off Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004).  Both parties were allowed an extra brief to address the issue, so there is no prejudice associated with it being raised for the first time in the reply.

power to exercise jurisdiction only over "Cases" and "Controversies."  As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action.[117]

The standing doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction."[118]  Standing considers whether there is a case or controversy at the time the action is filed, while "mootness ensures it remains one at the time a court renders a decision."[119]  "Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts."[120]

Even though the Trust had standing to assert a conservation fee claim at the time the First Amended Complaint was filed, "[a]n 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'"[121]  "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot."[122]

The Trust argues that the conservation fee claim is not moot despite Chevron's refund, because the royalty owners were not provided with adequate notice of the refund; it was included

---

[117]*Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[118]*Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[119]*Brown v. Buhman*, 822 F.3d 1151, 1163–64 (10th Cir. 2016).

[120]*Id.* at 1164.

[121]*Id.* at 1165.

[122]*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016).

with their monthly royalty checks with no disclosure that it had been included. The Trust

characterizes the payments as essentially a hidden settlement.

The Tenth Circuit has discussed the mootness inquiry in the class action context as

follows:

> [T]he Supreme Court has applied the mootness doctrine less strictly in the class
> action context. In light of the relative independence of the class entity from any
> one party, the Court has recognized the more "flexible character of the Art. III
> mootness doctrine" in the class action context. *U.S. Parole Comm'n v. Geraghty*,
> 445 U.S. 388, 400, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Thus, because a
> certified class becomes an independent juridical entity capable of satisfying the
> standing requirements of Article III, the mooting of a named plaintiff's claims
> after class certification does not moot the claims of the class. *See Franks v.
> Bowman Transp. Co*., 424 U.S. 747, 755–56, 96 S.Ct. 1251, 47 L.Ed.2d 444
> (1976); *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).
> And also, if the named plaintiff's claim becomes moot during the pendency of an
> appeal challenging the district court's denial of class certification, the appellate
> court is not divested of jurisdiction. *Geraghty*, 445 U.S. at 404 & n. 11, 100 S.Ct.
> 1202. Nor is an appellate court divested of jurisdiction if a defendant offers full
> settlement of the named plaintiffs' claims, over their objections, after the district
> court denies class certification. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S.
> 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).
>
> The Supreme Court has also suggested two situations in which a class may
> be certified despite the mooting of the named plaintiff's claim prior to the district
> court's certification decision: (1) when the plaintiff's claim is "'capable of
> repetition, yet evading review,'" and (2) when the plaintiff's claim is "inherently
> transitory [such] that the trial court will not have even enough time to rule on a
> motion for class certification before the proposed representative's individual
> interest expires." *Geraghty*, 445 U.S. at 398–400, 100 S.Ct. 1202 (quoting
> *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)).
> We have previously applied the "capable of repetition, yet evading review"
> exception to mootness in the class action context, permitting a class action to
> proceed despite the potential mootness of the named plaintiffs' claims in a case
> involving conditions at a school for juvenile boys. *See Milonas v. Williams*, 691
> F.2d 931, 937–38 (10th Cir. 1982).[123]

Another potential mootness exception may apply where a defendant "picks off" the named

plaintiffs before a class action can be certified.[124]

---

[123] *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138–39 (10th Cir. 2009).

[124] *See, e.g., Wilson v. Gordon*, 822 F.3d 923, 947 (6th Cir. 2016); *Fontenot v. McCraw*, 777 F.3d 741, 747–51 (7th Cir. 2015); *Lucero v. Bureau of Collection Recovery*, 639 F.3d 1239, 1250 (10th Cir. 2011).

It is undisputed that Chevron tendered payment, plus interest, to all Kansas royalty owners charged a conservation fee during the relevant time frame.  It is also undisputed that the Trust at least was not provided with notice of the conservation fee reimbursement along with its royalty check.  The Court can infer from the facts submitted that Chevron similarly did not provide notice to the other royalty owners that the credits on their royalty payments were for past conservation fees withheld, plus interest.

Given Chevron's failure to notify the Trust and other royalty owners of what was essentially an offer to settle the conservation fee claim in this case, Chevron's refunds are analogous to unaccepted offers of judgment.  The Supreme Court has recently held that an unaccepted offer of judgment in this context is insufficient to moot out a plaintiff's claim.[125]  Although the checks tendered to the Trust and the other royalty owners for conservation fees were not offers of judgment, the Court finds that the same rationale applies.  In *Campbell-Ewald*, the Court considered "basic principles of contract law" in concluding that without acceptance, "Campbell's settlement offer remained only a proposal, binding neither Campbell nor Gomez. . . . [W]ith no settlement offer still operative, the parties remained adverse; both retained the same stake in the litigation they had at the outset."[126]  Like the unaccepted offer of judgment in *Campbell-Ewald*, a defendant cannot unilaterally moot a plaintiff's case through an unaccepted settlement offer.  "[A] would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted."[127]

Also, the Supreme Court has explained that an order limiting communications between parties and putative class members requires "a clear record and specific findings that reflect a

---

[125] *Campbell-Ewald*, 136 S. Ct. at 669–70.

[126] *Id.* at 671.

[127] *Id.* at 672.

weighing of the need for a limitation and the potential interference with the rights of the parties," which involves "identifying the potential abuses being addressed."[128]  Here, there was no order in place based on record findings that communications between the parties and the potential class members was necessary due to the threat of abusive communications.  But the Court finds that Chevron's act of sending checks to royalty owners that included the conservation fee refund with interest, without notice or a conspicuous accounting, requires an order limiting communications going forward.  Although the Court does not find that Chevron's attempt at reimbursement was intended to harass or frighten, as some courts have, any attempt at a settlement in the class action context should be accompanied by fair notice.[129]  Before this Court will entertain another mootness challenge on this claim, it must be assured that the Trust and other royalty owners have been given notice and a fair opportunity to accept or reject Chevron's settlement offer.  The parties shall meet and confer and attempt to resolve this claim.  To the extent they are unable to resolve this claim without Court intervention, Chevron shall file a status report by **December 9, 2016**, stating its proposed course of action to provide notice to all members of the putative class about the conservation fee refund, and allow those royalty owners an opportunity to refund the settlement amounts tendered.

## VII.   Conclusion

The Court agrees with Chevron that the *Fawcett* decision controls disposition of the Kansas claims in this matter.  The Trust attempts to avoid the result of *Fawcett* by repackaging its implied duty of marketability argument as a breach of the duty of good faith and fair dealing.

---

[128] *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) .

[129] *See, e.g.*, *Zamboni v. Pepe W. 48th St., LLC*, No. 12 Civ 3157 (AJN)(JCF), 2013 WL 978935, at *2–4 (S.D.N.Y. Mar. 12, 2013) (requiring curative notice in FLSA case where employer solicited from employees during opt-in period waivers of claim for unpaid wages); *Sloan v. Ameristar Casinos, Inc.*, No. 12-cv-1126-MSK-KMT, 2013 WL 1127062, at *1 (D. Colo. Mar. 18, 2013) (discussing sanctions order where executive for the defendant sent a letter to potential class members that the court found  was "intentionally intended to frighten and dissuade former employee putative class members from joining the class.").

But *Fawcett* addresses the issues raised by the Trust, regardless of the label.  The lease language is virtually identical.  As in *Fawcett*, the gas here was sold and marketed at the well and the quality of the gas does not dictate a finding that the gas was not in a marketable condition. Therefore, in order to satisfy the marketable condition rule and allow for midstream costs to be shared with the royalty owners, the gas was required to be acceptable to ONEOK, the third-party purchaser, at the time of delivery, and the third-party purchase agreements must have been good faith transactions.  Chevron satisfied its summary judgment burden of showing an absence of evidence that the gas was either not acceptable to ONEOK, or that the four third-party purchase agreements were not good faith transactions.  The Trust has not come forward with specific evidence to show that these particular transactions do not meet the standards set forth in *Fawcett*, and this Court declines to make a generalized finding that the sales arrangements at issue in this case, which were also at issue in *Fawcett*, constitute sham sales designed to circumvent the marketable condition rule.

Moreover, the Trust has not come forward with evidence that Chevron breached the duty of good faith and fair dealing implied in the lease.  The Trust has failed to point to an existing provision in the lease that required Chevron to pay royalty on proceeds minus post-sale expenses incurred by third party purchasers to add further value to the gas before it entered the interstate pipeline.  Moreover, there is no specific evidence in the record about the third-party transactions in this case that suggests Chevron breached the good faith and fair dealing duty it owed the Trust when they were executed. As such, summary judgment is granted in favor of Chevron on the marketable condition rule claim.

Because Chevron failed to provide notice to the Trust and putative class members that its payments of the conservation fees charged between 2009 and 2012, plus interest, were credited

on royalty payments, the conservation fee claim is not moot.  As such, summary judgment is denied on this component of the breach of lease claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment as to Lambert and Motion to Dismiss All Kansas Claims (Doc. 40) is **granted in part and denied in part**.  The motion is denied as to the Conservation Fee claim and is otherwise granted on the Kansas breach of lease claim.

       **IT IS FURTHER ORDERED BY THE COURT** that The Trust's Motion to Strike Most of the Declaration of Alan Bates as Improper Opinion and Conclusory Testimony (Doc. 119) is **denied**.

       **IT IS SO ORDERED.**

Dated: November 9, 2016

                              S/ Julie A. Robinson
                              JULIE A. ROBINSON
                              UNITED STATES DISTRICT JUDGE